VERNON J. CRISTINA and ANTOINETTE CRISTINA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JESS A. RODRIGUES and JERALYN RODRIGUES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cristina v. Commissioner
Docket Nos. 2000-76, 2001-76.
United States Tax Court
T.C. Memo 1979-280; 1979 Tax Ct. Memo LEXIS 246; 38 T.C.M. (CCH) 1093; T.C.M. (RIA) 79280; July 25, 1979, Filed; As Amended Robert P. Schalk and Andrew L. Faber, for the petitioners. Eugene H. Ciranni, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Dkt. No.
Petitioners
Year
Deficiency
2000-76
Vernon J. Cristina
1971
$10,201
and Antoinette
Cristina
2001-76
Jess A. Rodrigues
1971
$21,830
and Jeralyn Rodrigues
*247 These cases have been consolidated for purposes of trial, briefing, and opinion. Concessions having been made, only two issues remain for our decision: 1) Whether the payment of $149,625 by the Ocean Shadow Venture partnership to Continental Services, Inc., in December of 1971 is deductible in the computation of the partnership income for 1971 of petitioners Christina and Rodrigues. 2) Whether the payment of $49,680 by the Continental Gardens partnership to the Union Bank of California in December of 1971 is deductible as interest "paid" within the taxable year under section 163(a) [1] in the computation of the partnership income for 1971 of petitioner Rodrigues. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Vernon J. and Antoinette Cristina and Jess A. and Jeralyn Rodrigues, were all residents of the State of California at the time of filing their petitions herein. In December of 1971, petitioners Vernon J. Cristina (Cristina) and Jess A. Rodrigues (Rodrigues) formed a California limited *248 partnership known as Ocean Shadow Venture (O.S.V.). Cristina and Rodrigues were both general and limited partners in O.S.V. The purpose of O.S.V. was to acquire and develop a 40-acre tract and a 106-acre tract of land located near Scotts Valley, Calif. Although the 40-acre tract was never acquired, the 106-acre tract was purchased by O.S.V. in December of 1971 for a total purchase price of $688,317. Pursuant to the terms of the purchase agreement, 10 percent of the total purchase price was paid in 1971 and O.S.V. gave the sellers a note for the balance. The note was secured by a first deed of trust on only 96 acres because under the purchase agreement O.S.V. was given clear title to 10 acres of the tract. Cristina and Rodrigues planned to build apartments, condominiums, and a shopping center on this 106-acre tract of land. To finance this project, O.S.V. entered an agreement with Continental Securities, Inc. (C.S.I.) on December 15, 1971.This agreement provided that C.S.I. would loan to O.S.V. $1,575,000 for one year at an annual rate of interest of 9 1/2 percent. In connection with this loan agreement, on December 30, 1971, a one year promissory note for $1,575,000 was *249 drawn up by C.S.I. and O.S.V. The parties agreed that this note would be executed by O.S.V. if and when the $1,575,000 was loaned to it by C.S.I. The note provided for the 9 1/2 percent interest to be paid in advance. On December 31, 1971, O.S.V. paid C.S.I. $149,625. Before Cristina and Rodrigues could develop the 106-acre tract, the land had to be rezoned to permit commercial development. Therefore, during 1972 O.S.V. filed a rezoning application with the City of Scotts Valley Board of Zoning Adjustment. However, many citizens of Scotts Valley opposed such commercial development. After petitioners modified their rezoning application several times in an effort to overcome public opposition to their plan, in 1974 the Scotts Valley City Council rezoned the land to permit construction of single family dwellings. No commercial development, however, was allowed under this rezoning ordinance. Moreover, the ordinance required O.S.V. to bear the cost of constructing a sewage treatment plant and an intersection complete with traffic signals. In light of the prohibition on commercial development and the conditions imposed by the rezoning ordinance, in 1974 the O.S.V. partners decided *250 to abandon the project to develop the 106-acre tract of land. O.S.V. then made several unsuccessful attempts to find a buyer for the land. The original sellers eventually foreclosed on the 96 acres which were subject to the deed of trust. Since O.S.V. abandoned the Scotts Valley project, it no longer had any need for the $1,575,000 it had planned to borrow from C.S.I. Consequently, O.S.V. never borrowed any part of this sum from C.S.I. However, during both 1973 and 1974 C.S.I. was prepared to loan O.S.V. the $1,575,000 if the Scotts Valley Project had been approved for development during this period. During 1971, Rodrigues was a partner in Continental Gardens (Continental), a California limited partnership. Continental filed its income tax return for 1971 on a calendar year basis using the cash basis method of accounting. [2] The purpose of Continental was to build and operate an apartment complex in Santa Clara, Calif. To finance this project, in 1971 Continental obtained a combined construction and permanent loan of $1,241,050.88 from the Union Bank of California (Union Bank). Under the financing arrangement, the Government National Mortgage Association (GNMA) agreed to *251 purchase the loan from Union Bank after construction of the apartment complex was complete at a price equal to 96 percent of the face amount of the loan. Union Bank, however, was concerned about losing this four percent when it sold the loan to GNMA. Consequently, one of the terms of the loan with Continental was that Continental was obligated to pay Union Bank the four percent discount. GNMA demanded the four percent discount because it wanted a higher effective rate of interest on the loan than that which had been set by the FHA. On December 30, 1971, Rodrigues delivered a check for $49,680 drawn on Continental's bank account to an officer of Union Bank with the express intention of paying the four percent discount. On December 21, 1976, G. H. Dillon, an assistant vice president of Union Bank, wrote Rodrigues a letter in which he acknowledged that on December 30, 1971, Union Bank accepted a check for $49,680 from Continental as payment of the four percent discount. *252 Using the $49,680 it had received from Continental, on February 16, 1972, Union Bank purchased a certificate of deposit in Continental's name in the amount of $49,680 payable on June 27, 1972, and bearing interest from December 30, 1971. When this certificate of deposit expired, Union Bank reinvested the proceeds and the interest in another certificate of deposit. Union Bank continued this procedure until June 25, 1973, when the fifth certificate of deposit expired. In July of 1973, Union Bank applied $4,944.11 of the certificate proceeds against an unrelated debt for which Continental was liable and with the balance of the proceeds, $48,373.11, the bank purchased another certificate of deposit in the name of Continental. Union Bank's decision in February of 1972 to invest the $49,680 in a certificate of deposit on behalf of Continental was made without Rodrigues' knowledge or consent. It was not until sometime during 1973 that Rodrigues learned of the existence of the certificate of deposit. In April of 1973 GNMA purchased the permanent loan from Union Bank. At the same time, Union Bank charged Continental's borrower's fund account with $49,624.04, an amount equal to the *253 GNMA four percent discount. On the 1971 partnership return of O.S.V., the $149,625 payment O.S.V. made to C.S.I., was deducted as interest. In the statutory notice, respondent disallowed this treatment and increased Cristina's and Rodrigues' distributive shares of the partnership income accordingly. Similarly, on the 1971 partnership return of Continental, the $49,680 payment to Union Bank was deducted as interest. In the statutory notice respondent disallowed this treatment and increased Rodrigues' distributive share of the partnership income accordingly. OPINION The first issue we must decide is whether the payment of $149,625 by O.S.V. to C.S.I. in December of 1971 is deductible in the computation of the partnership income for 1971 of petitioners Christina and Rodrigues. In their original petitions, petitioners claimed that the $149,625 payment was deductible in 1971 as interest under section 163 or as a standby commitment fee under section 162. Petitioners subsequently filed amended petitions in which they argued that if the Court should find that they were not entitled to a deduction in 1971 under section 163 or section 162, then in the alternative petitioners were *254 entitled to an abandonment loss deduction in 1974. On brief, petitioners have abandoned their initial argument that the $149,625 payment was deductible in 1971 under sections 163 or 162. Instead, they address only the alternative argument made in their amended petition. Petitioners claim that that $149,625 was paid to C.S.I. for its open-ended commitment to lend O.S.V. $1,575,000 when the Scotts Valley project was ready for development. They argue that this fee created an asset which became worthless upon the abandonment of the Scotts Valley project in 1974, and thus they are entitled to an abandonment loss for 1974. While respondent agrees with petitioners that the $149,625 payment constituted a loan commitment fee, he interprets the agreement entered into by O.S.V. and C.S.I. as being a one-year commitment to make a loan, which agreement expired in 1972. Therefore, according to respondent, the deduction is allowable only in 1972. We agree with the parties that the $149,625 payment represented a loan commitment fee. However, we do not believe the commitment was only for the year 1972 as respondent contends. On the contrary, we think the commitment was openended. The *255 record shows that C.S.I. was prepared to lend O.S.V. the $1,575,000 during 1973 and 1974 if the Scotts Valley project had been approved for development during this period. Moreover, we believe this commitment became worthless in 1974 when the Scotts Valley project was abandoned by O.S.V. However, one of the limitations on the Tax Court's jurisdiction is that the Court has no authority to redetermine the tax liability for years for which the respondent has not asserted a deficiency. See sec. 6214(b); Commissioner v. Gooch Milling & Elevator Co., 320 U.S. 418, 420 (1943). In the present case, the only taxable year for which the respondent has assessed deficiencies against petitioners is 1971. Therefore, the only taxable year over which we have jurisdiction is 1971. Since petitioners on brief abandoned their arguments with respect to the deductibility of the $149,625 payment in 1971, we have no choice but to sustain respondent's determination that this payment was not deductible in the computation of the partnership income for 1971 of petitioners Christina and Rodrigues. 2a *256 To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.↩
2. In paragraph 5(g) of Rodrigues' amended petition, it is alleged that during the years in issue Continental used the cash basis method of accounting. Respondent denied generally this allegation as well as all others made in paragraph 5(g). However, Continental's method of accounting was not disputed by the parties either at trial or on brief. We are, therefore, treating Continental as a cash basis partnership for the taxable year 1971.↩
2a. Petitioner Rodrigues filed two amendments to his petition. In the first amendment, Rodrigues claims that if he is entitled to an abandonment loss in 1974 for his share of the $149,625 payment, then such abandonment loss gives rise to a net operating loss in 1974 which he is entitled to carry back to 1971. Similarly, in the second amendment, Rodrigues claims that if he is entitled to an abandonment loss in 1973 for some portion of the $149,625 payment, then such abandoment loss gives rise to a net operating loss in 1973 which he is entitled to carry back to 1971. However, Rodrigues presented no evidence at trial nor any arguments on brief in support of either the 1973 or 1974 claimed net operating losses. We, therefore, conclude that Rodrigues has abandoned both of these claims. Even if we were to hold that Rodrigues did not abandon these two claims, based on the record in this case as well as our holding on the first issue, neither claim would be allowable. Since we have held that the abandonment occurred at the earliest in 1974, there is no basis for Rodrigues' claimed 1973 net operating loss. With respect to the claimed 1974 net operating loss, there is no pertinent evidence in the record to establish such a loss in 1974. The most fundamental piece of evidence necessary to establish such a loss is Rodrigues' 1974 individual Federal income tax return, which was not offered or received into evidence at trial. Thus, Rodrigues has failed to carry his burden of proof that an abandonment loss in 1974 would give rise to a net operating loss in 1974 and entitle him to a net operating loss carryback deduction for 1971. The second issue for our decision is whether the payment of $49,680 by the Continental Gardens partnership to the Union Bank of California in December of 1971 is deductible as interest "paid" within the taxable year under section 163(a) in the computation of the partnership income for 1971 of petitioner Rodrigues. Section 163(a) permits a deduction for all interest paid or accrued within the taxable year on indebtedness. Under this section, cash basis taxpayers may deduct interest only in the year of actual payment. Christensen v. Commissioner, 40 T.C. 563, 577-578 (1963). It is now well established that the payment required to secure a deduction can be made either with cash or by check. Rubnitz v. Commissioner, 67 T.C. 621, 627 (1977); Estate of Spiegel v. Commissioner, 12 T.C. 524, 529 (1949). Furthermore, included within the meaning of the term "interest" are additional percentage points paid by a borrower at the closing of a loan if such "points" are paid for the use of the borrowed money. Baird v. Commissioner, 68 T.C. 115, 129 (1977). In the present case, respondent does not dispute the fact that the four "point" discount paid by Continental is deductible as interest. Respondent does, however, argue that the proper year for the deduction is 1973 rather than 1971. Respondent's position is that since Union Bank purchased a certificate of deposit in Continental's name with the $49,680 it received from Continental in 1971, no actual payment occurred until 1973 when Union Bank charged Continental's borrower's fund account in an amount equal to the GNMA four point discount. Petitioner Rodrigues, on the other hand, contends that actual payment was made in 1971 when he delivered a check for $49,680 drawn on Continental's bank account to an officer of Union Bank on December 30, 1971.
Having reviewed the entire record in the present case, we conclude that Continental, a cash basis partnership, actually paid the $49,680 as interest to Union Bank in 1971. In reaching this conclusion, we place particular emphasis on Rodrigues' testimony and the stipulated exhibits. We found Rodrigues' testimony to be candid, forthright, and credible.It is clear to us from his testimony that he delivered the check for $49,680 to an officer of the Union Bank with the express intention of paying the four point discount. It is also clear to us from his testimony that Union Bank's decision to invest the $49,680 in a certificate of deposit on behalf of Continental was unilateral. Rodrigues had no knowledge of the certificate of deposit until almost two years after he had paid Union Bank the $49,680. Moreover, an assistant vice president of Union Bank acknowledged by letter that Union Bank accepted the $49,680 check as payment of the four point discount when it was delivered by Rodrigues on December 30, 1971. Accordingly, we hold that the payment of $49,680 by Continental to the Union Bank in December of 1971 is deductible as interest "paid" within the taxable year under section 163(a) in the computation of the partnership income for 1971 of petitioner Rodrigues. Since respondent's sole argument was that the four point discount was deductible in 1973 rather than in 1971, we do not reach the question of whether the discount must be deducted ratably over the term of the loan.
[3]↩